**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
════════════════════════════════
                               )
KAROLYN PIERCE,                )
                               )
          Plaintiff,           )
                               )
v.                             )          Civil Action
                               )          No. 15-13596
CAROLYN W. COLVIN,             )
Acting Commissioner of Social  )
Security Administration,       )
                               )
          Defendant.           )
════════════════════════════════)
```

**MEMORANDUM AND ORDER**

March 24, 2017

Saris, C.J.

**INTRODUCTION**

Plaintiff Karolyn Pierce, who has had a long history of knee problems and been on a regimen of pain medications, seeks judicial review of the decision by the Social Security Administration ("SSA") to deny her claim for Supplemental Security Income ("SSI") benefits. Plaintiff argues that 1) the Administrative Law Judge ("ALJ") failed to give the opinion of her treating physicians proper weight, 2) the ALJ erred in evaluating Plaintiff's credibility concerning her complaints of pain and the effects of her pain medication, and 3) the ALJ's Residual Functional Capacity ("RFC") findings were not supported

1

by the medical evidence. Defendant moves to affirm the Commissioner's Decision.

For the reasons set forth below, the Court **ALLOWS** Plaintiff's motion to reverse and remand the decision of the Commissioner (Docket No. 11). The Court **DENIES** the Defendant's motion to affirm the Commissioner's decision (Docket No. 12).

## FACTUAL BACKGROUND

At the time of the hearing before the ALJ on April 14, 2015, Plaintiff was forty years old. R. 132. The ALJ denied her request for reconsideration on May 20, 2015. R. 11-22.

### I. Work History and Education

A high school graduate, Plaintiff worked as an underwriting assistant from March 2003 to April 2013. R. 166. In April 2013, Plaintiff was terminated due to "company cutbacks" and has not worked since. R. 157. She alleges disability beginning June 5, 2013. R. 132.

### II. Medical History

Plaintiff's medical records indicate a long history of knee disorders in both knees. Plaintiff also reports side effects of pain medications that make daily activities difficult. Three treating physicians submitted opinions or evaluations in support of Plaintiff's application for disability benefits: 1) her primary care physician Dr. Steven Flood who treated her beginning in October 2013; 2) orthopedic surgeon Dr. Timothy

Foster who treated Plaintiff from 2012 until 2014 and performed multiple surgeries on both of Plaintiff's knees; and 3) orthopedic surgeon Dr. Henry Bedair, who treated Plaintiff from 2014 onward and also performed multiple knee surgeries, including total knee replacements on both of Plaintiff's knees. State Agency physicians Dr. Harold Ramsay and Dr. Rosario Palmeri also submitted opinions for this case but did not physically examine Plaintiff.

Prior to the claimed disability onset date, the lengthy medical record reflects seventeen knee surgeries dating back to 2001. R. 241-59. Despite these surgeries, the problems in Plaintiff's right knee persisted. In late July 2011, Plaintiff met with orthopedic surgeon Dr. Patz complaining of instability and pain in her right knee. R. 284. The doctor recommended that she use a brace. R. 284. In April 2012, Plaintiff again met with Dr. Patz because "her right knee gave way" a few days before. R. 282. An x-ray taken at the time showed "degenerative changes" in her right knee joints. R. 282. Dr. Patz recommended the continued use of a brace and eventually referred Plaintiff to Dr. Timothy Foster, orthopedic surgeon, for further evaluations. R. 280-82. In June 2013, Plaintiff met with Dr. Timothy Foster regarding her right knee pain, R. 267, he recommended surgery on her right knee. R. 280-82.

On the disability onset date of June 5, 2013, Plaintiff had a patellofemoral arthroplasty (kneecap replacement) surgery on her right knee. R. 268-69, 331-35. Prior to the surgery, Plaintiff had been prescribed Percocet and Lovenox (a blood thinner). R. 268. After the surgery, Plaintiff was given Valium to be used "as a muscle relaxer" but was "cautioned against its sedative effect." R. 269. Plaintiff was also administered a refill of Oxycodone for pain and continued to take Lovenox. R. 269. Medical records from appointments with Dr. Foster and Sarah Larch, PA-C (physician's assistant) in July and August of 2013 state that Plaintiff continued to take prescribed narcotic medications for pain and required a brace to walk because her "leg [felt] weak without the brace." R. 270-71. At these appointments, doctors noted that Plaintiff was taking Vicodin in addition to her other pain medications, but that she "require[d] no narcotic medication during the day." R. 270.

At a follow-up appointment in August with Dr. Foster, Plaintiff was cleared to drive and her prescription doses were lowered in order to "begin the weaning process." R. 270. In October 2013, Plaintiff had "giving way episodes" and reported still needing the brace. R. 272. Dr. Foster recommended that Plaintiff stop using the knee brace as he felt it "may be limiting her ability to strengthen the quadriceps." R. 272. At the six-month follow up appointment in October 2013, Dr. Foster

reported full extension ability of the right knee, flexion to 120 degrees and ability to perform straight leg raises. R. 273. Additionally, he noted that Plaintiff "will wean off the pain medicine as tolerated." R. 273.

Plaintiff met with Dr. Steven Flood, a family medicine doctor, on October 10, 2013 to discuss her ongoing knee problems and to discuss her medications, at which point Dr. Flood advised Plaintiff to stop taking Vicodin and start taking Oxycodone. R. 369.

On March 5, 2014, Dr. Flood again met with Plaintiff regarding her knee problems. R. 367-68. Dr. Flood referred her back to Dr. Patz for a second opinion and "to review her history for any other treatment possible." R. 368. He also referred her to a local pain clinic "for help in managing her ongoing symptoms" of knee pain. R. 368.

At her appointment with Dr. Patz on March 7, 2014, Plaintiff reported persisting pain and buckling. R. 277. Plaintiff used various knee braces without improvement, she could not wear high heels, had a decreased activity level, and was finding herself in bed all day, although the pain was "not keep[ing] her up at night." R. 277. Plaintiff "increase[d] her pain medication of Oxycodone to five times a day" in addition to taking Diazepam four times a day and Neurontin twice a day. R. 277. Her "current medication" list in the record also includes

Amitriptyline and Tramadol. R. 278. Dr. Patz referred her to Dr. Schepsis for a follow-up appointment to discuss her ongoing knee pain. R. 277. Additionally, Dr. Patz noted that Plaintiff was "too young for a total knee replacement at this point." R. 277.

Later that month, Plaintiff was seen by a nurse practitioner in Dr. Flood's office for a gynecology exam. R. 363. At that exam, Plaintiff reported that she was "discouraged because of her knee pain and limitations on life style because of the knee pain." R. 363. Plaintiff also mentioned she was looking for work and she wanted to return to work because she was "bored at home." Plaintiff also stated she was "sick of taking pills" and wanted "to be active and off pills." R. 363.

On March 24, 2014, Plaintiff had a pain management consultation with Dr. Anita Sadasivan Dasari, MD. R. 307-09. Plaintiff reported that, in order to make the "pain tolerable to function throughout the day," she was taking Oxycodone four times a day (since June 2013), Tramadol four times a day, Diazepam four times a day for muscle spasms and restless leg syndrome, Gabapentin three times a day and Amitriptyline once a night. R. 307. Plaintiff also reported that these medications made her tired, and only provided fifty percent relief. R. 307. She experienced sleep disturbance due to her pain. R. 307. Plaintiff also stated that her average pain score was "5/10-

10/10," and the pain increased by walking or standing but improved by lying down. R. 307. At that appointment, Dr. Dasari recommended Plaintiff begin taking Baclofen for muscle spasms and "consider decreasing Valium in the future." R. 308.

In April 2014, Plaintiff met again with PA-C Larch in Dr. Foster's office and reported continued pain and frequent buckling in her right knee. R. 274. Plaintiff mentioned being "frustrated with her current state and ongoing pain." R. 274. PA-C Larch reported that Plaintiff should continue her pain management program and would be considered for another diagnostic arthroscopy surgery (wherein a camera is inserted via a small incision in the knee to inspect and remove bone debris) in 3 months if her condition did not improve. R. 274.

At her next appointment with Dr. Dasari in May 2014, Plaintiff reported she had to stop taking Baclofen because it caused dizziness and did not relieve her pain. R. 304. Plaintiff also reported that her right knee pain was worse than her left knee pain, and that she did "not trust herself to walk too far." R. 304. Plaintiff further stated that "her feet and calves start twitching in the night or when she has been in one spot too long." R. 304. Plaintiff was taking Gabapentin, Tramadol, Amitriptyline, Valium, and Oxycodone and said her current average pain score was a "4-9/10." R. 304. Dr. Dasari started Plaintiff on Robaxin as an alternative to Baclofen and increased

7

her Amitriptyline dosage. R. 305. Dr. Dasari also recommended that Plaintiff speak to Dr. Flood about restless leg syndrome. R. 305.

Plaintiff met with Dr. Foster again in May, and continued to report pain in both knees, "however [at this time] the left knee was by far the worse." R. 275. Dr. Foster and Plaintiff agreed to proceed with a diagnostic arthroscopic surgery of the left knee at that time to assess whether the knee would need a total replacement. R. 275. Dr. Foster performed the surgery on June 16, 2014. R. 322-23. After the surgery, Dr. Foster reported that "the patient is clearly headed for a total knee replacement." R. 324.

At a post-operative appointment a few days later, Dr. Foster and Plaintiff discussed and agreed to perform a surgery on the right knee in order to determine whether that knee would also need a total replacement. R. 324. Subsequently, the surgery was performed on the right knee in July 2014. R. 319-20. The surgery revealed significant cartilage defect, but Dr. Foster advised Plaintiff to continue with home exercise and receive further evaluations. R. 321.

In late July 2014, Plaintiff met with Dr. Flood because of decreased mental clarity, slurred speech, and slow gait in the two months after her diagnostic surgeries. R. 359. Dr. Flood posited that the symptoms were "probably related to over

medication" and recommended reducing her Amitriptyline and Gabapentin doses, but continuing her Oxycodone dose. R. 359-60. In August, Plaintiff once again met with Dr. Flood for continued mental confusion and weakness. R. 357. She reported that she had fallen "several times since her last visit and was unable to get up." R. 357. At the time Plaintiff was taking Robaxin (a muscle relaxer), Amitriptyline, Diazepam, Pramipexole (for restless leg syndrome), Oxycodone, Gabapentin, and Tramadol. R. 357.

On September 8, 2014, Dr. Bedair performed a total right knee replacement on Plaintff. R. 426-27. During her post-operation appointment in mid-October, Plaintiff reported "occasional discomfort." R. 400. Dr. Bedair also noted that Plaintiff was weaning off pain medication and that physical therapy was yielding steady progress. R. 400.

On December 10, 2014, Plaintiff had a total left knee replacement, also performed by Dr. Bedair. R. 447-48. After the surgery, Plaintiff reported "numbness of the right face, scalp, and neck. . . ." R. 450. An MRI revealed no conclusive explanation for the numbness. R. 455. Dr. Bedair advised that Plaintiff see a neurologist to follow up. R. 455.

At the end of December, Plaintiff met with Dr. Flood for a follow-up appointment after her surgery. R. 487. Plaintiff reported that she was continuing physical therapy at home but she had fallen twice. R. 487. At the time, she was taking

Dilaudid for pain in addition to Oxycodone; Dr. Flood recommended she should start taking MS Contin. R. 487. When she met with Dr. Flood again in early January 2015, Dr. Flood reported that "the visiting nurse and visiting physical therapist . . . thought she was dopey or groggy from all the medication." R. 485. Plaintiff reported that she was taking MS Contin for the pain and that it made her fall asleep but the pain was still significant. R. 485. Plaintiff was also taking Diazepam, Robaxin, Amitriptyline, Oxycodone, and Gabapentin. R. 486. Dr. Flood recommended she stop taking Diazepam and reduce the MS Contin dosage. R. 486. When Plaintiff met with Dr. Flood again a few days later, he reported that she seemed "mentally clearer" because she was taking a reduced dosage of MS Contin, but her pain would come back more quickly. R. 483.

Around this time, during her post-operative follow up appointment with Dr. Bedair's office in January, Plaintiff reported substantial post-surgery pain in her left knee. R. 474. Plaintiff was trying to manage her pain by taking Oxycodone and Gabapentin and working with Dr. Flood. R. 474. Plaintiff also continued to experience numbness on the right side of her face. R. 474.

In February, Plaintiff met with Dr. Flood to review her pain management. R. 481. Plaintiff seemed mentally clearer at this time. R. 481. Plaintiff continued to take Oxycodone,

Gabapentin, MS Contin, and Robaxin. R. 481-82. Plaintiff had
muscle cramps and stiffness of the left leg, and was still
experiencing some facial numbness. R. 481. Dr. Flood recommended
she stop taking Robaxin and start taking Baclofen. R. 482. When
Plaintiff met with Dr. Flood in March 2015, she had been
hospitalized two weeks prior for a "change in mental status and
concern about overmedication." R. 479. During that hospital
stay, her medications were adjusted and she was discharged on a
lower dosage of Morphine and Oxycodone. R. 479. Additionally,
upon the administration of a CT scan, Dr. Flood discovered that
Plaintiff had a fracture at the site of her left knee
replacement. R. 479. A follow-up appointment was scheduled with
orthopedics for later that month. R. 479. The medical record
ends at this point.

### III. Treating Physicians' Evaluations

#### a. Dr. Flood's Treating Source Statements and Medical Assessment

Dr. Steven Flood provided a treating source statement for
this case on July 22, 2014. R. 356. In the statement, Dr. Flood
wrote that Plaintiff had been under his care for routine health
as well as "a long history of" orthopedic problems with her
knees. R. 356. Dr. Flood continued that Plaintiff had multiple
surgical procedures and was under treatment for chronic pain
with "six different medications." R. 356. He believed that "as a

result of the combined medications' side effects" Plaintiff
would not be able to work in any capacity. R. 356. Dr. Flood
considered Plaintiff to be "permanently disabled," and believed
the disability would last for at least 2 years and could be
permanent. R. 356. Dr. Flood's office submitted an identical
treating source statement on August 11, 2014. R. 394.

Dr. Flood also completed and submitted a Physical Residual
Function Capacity Assessment ("RFC Assessment") report on
November 10, 2014. R. 431-38. In this report, Dr. Flood opined
that Plaintiff could occasionally or frequently lift less than
10 pounds, could stand or walk for less than 2 hours in a normal
eight-hour workday (and would medically require an assistive
device for ambulation), would have to periodically alternate
sitting and standing to relieve pain and discomfort, and could
push or pull only a limited amount in her lower extremities.
R. 432. Dr. Flood cited to Plaintiff's need for a cane or walker
as evidence of his assessment of Plaintiff's exertional
limitations. R. 432.

Dr. Flood stated in the report that Plaintiff's postural
limitations meant she could never climb ramps or stairs,
balance, stoop, kneel, crouch, or crawl. R. 433. He also noted
that Plaintiff was limited in her ability to reach in all
directions. R. 434. Dr. Flood assessed that Plaintiff's
environmental limitations included having to avoid concentrated

exposure to wetness, humidity, and noise, and having to avoid
moderate exposure to extreme cold and extreme heat. R. 435. He
also believed that Plaintiff should avoid all exposure to
hazards (machinery, heights, etc.) and vibrations. R. 435.

Dr. Flood also provided an assessment of Plaintiff on March
25, 2015. R. 495. This assessment stated that Plaintiff has had
"multiple surgical procedures on both knees" and is "under
treatment for chronic pain with multiple different medications."
R. 495. "As a result of the combined medications' side effects,
chronic pain, and stiffness in her leg, she is not able to work
in any capacity." R. 495. On this basis, Dr. Flood considered
Plaintiff to be "permanently disabled," with the disability
lasting at least two years, but perhaps permanently. R. 495.

### b. Dr. Bedair's Medical Assessment

Dr. Henry Bedair completed and submitted a RFC Assessment
on November 19, 2014. R. 439-46. In this report, Dr. Bedair
opined that Plaintiff could occasionally lift 20 pounds,
frequently lift 10 pounds, could stand or walk for at least 2
hours in a normal eight-hour workday, could sit for about 6
hours in an eight-hour workday, and could push or pull only a
limited amount in her lower extremities. R. 440. Dr. Bedair did
not opine on postural limitations, manipulative limitations, or
environmental limitations. R. 441-43. Dr. Bedair did not comment
on Plaintiff's pain medication.

### c. Dr. Foster's Treating Source Statement

On August 15, 2014, Dr. Foster submitted a treating source statement on behalf of Plaintiff's application for disability benefits. R. 395. Dr. Foster stated that Plaintiff had "significant pain and will require total knee replacements." R. 395. Dr. Foster further stated that Plaintiff "[required] daily narcotic pain medication to help alleviate the pain" and that she was "unable to work for quite some time." R. 395. Dr. Foster noted that Plaintiff had difficulty managing stairs and difficulty with "activities of daily living." R. 395. Dr. Foster concluded that his office "supports the patient['s] application for Social Security disability." R. 395.

## IV.  State Agency Physicians' Evaluations

### a. Dr. Harold Ramsay

On June 20, 2014, Harold Ramsay, M.D., a state agency physician, conducted a review of the record and completed an assessment of Plaintiff's RFC. R. 64-71. In Dr. Ramsay's assessment, Plaintiff could occasionally lift or carry 20 pounds, could frequently lift or carry 10 pounds, could stand or walk for a total of 6 hours at a time (in an eight-hour workday), could sit for a total of 6 hours at a time (in an eight-hour workday), could push or pull unlimited weights, and had some postural limitations. R. 68. Postural limitations noted by Dr. Ramsay included never being able to climb ladders,

occasionally climbing ramps or stairs, and only occasionally balancing, stooping, crouching, kneeling and crawling. R. 68.

Dr. Ramsay also stated that Plaintiff could functionally cook, do laundry, clean, drive, and shop -- although Plaintiff could only walk a few yards before needing to stop and rest. R. 69. Finally, Dr. Ramsay determined that Plaintiff's statements were only partially credible since "the difficulty sitting [was] out of proportion of the objective physical findings and [her daily activities like] driving." R. 69. Dr. Ramsay concluded that, based upon the available record, the impairments were severe but did not meet the listings of impairments constituting disability. R. 69. Finally, Dr. Ramsay said Plaintiff had the RFC to perform past relevant work and, thus, was not disabled. R. 70. Other than noting that the Plaintiff "remains on long term oxycodone," Dr. Ramsay did not comment on Plaintiff's pain medication or side effects thereof. R. 67.

### b. Dr. Rosario Palmeri

On August 5, 2014, Dr. Rosario Palmeri, M.D., another state agency physician, conducted a review of the record and completed an assessment of Plaintiff's RFC. R. 73-80. Dr. Palmeri noted that there would be total knee replacements on both knees occurring soon after her report. R. 74.

Dr. Palmeri assessed Plaintiff could occasionally lift or carry 20 pounds, could frequently lift or carry 10 pounds, could stand for a total of 2 hours, could sit for a total of 6 hours (in an eight-hour workday), and could push or pull an unlimited amount. R. 77. Dr. Palmeri also noted that Plaintiff had postural limitations including never being able to climb ladders and only occasionally being able to climb stairs, balance, stoop, kneel, crouch, and crawl. R. 77-78. Dr. Palmeri further noted that Plaintiff should avoid concentrated exposure to vibrations or hazards (machinery, heights, etc.). R. 78.

Dr. Palmeri stated that Plaintiff, in her daily activities, could clean, drive, and shop, but could only walk a few yards before needing to stop and rest. R. 78. Dr. Palmeri opined that Plaintiff's statements regarding difficulty sitting were out of proportion to the objective physical findings and so Plaintiff's statements were only partially credible. R. 79. Dr. Palmeri concluded that Plaintiff's conditions were severe but did not meet the listings for disability and that Plaintiff's obesity was "non-severe, but . . . contributes to her limitations." R. 79. Dr. Palmeri further concluded that Plaintiff had the RFC to perform past relevant work, and thus was not disabled. R. 79-80. Dr. Palmeri did not comment on Plaintiff's pain medications or side effects of the medications other than noting that Plaintiff

informed Dr. Palmari that the medications she is currently
taking make her tired. R. 76.

## V.   Hearing Before the ALJ

The administrative hearing was held on April 14, 2015
before ALJ William Ramsay. R. 43. Plaintiff waived her right to
an attorney and was not represented by counsel. R. 130-31, 45-
46.

### a. Plaintiff's Testimony

Plaintiff testified at the hearing as follows: Plaintiff's
highest level of education completed is high school. R. 49.
Plaintiff worked as an underwriter's assistant from 2003 until
2012 at Narraganset Bay Insurance Company ("NBIC"). R. 51.
Plaintiff was laid off from NBIC in April 2013, and has not
worked since that time. R. 51-52.

When asked by the ALJ to explain her typical day, Plaintiff
stated that she wakes up in the morning and takes pain
medication and then goes back to sleep for a few hours. R. 52.
Plaintiff then wakes up mid-afternoon and takes "what [she]
needs" of her pain meds based on how much pain she is in, and
puts ice on her knee to help the swelling. R. 52. Plaintiff
testified that she tries to help her husband cook dinner R. 53.
Plaintiff experiences difficulty cooking alone because she has
difficulty standing on her left knee. R. 53. She then takes
medication for the night time and goes back to bed. R. 53.

Around 3:00 A.M., Plaintiff wakes up again and takes oxycodone
"when the pain starts hitting me again . . . to get [her]
through until [her] next set of pain meds" and then goes back to
sleep. R. 53.

Prior to both total knee replacement surgeries, Plaintiff
had undergone nearly half a dozen procedures on both knees to
try and cure her pain, but none were successful. Plaintiff
testified that although her right knee had given her pain "[her]
whole life," the right knee was no longer giving her pain. R.
53. Plaintiff testified the pain in her right knee cleared up
"immediately" after the total knee replacement surgery done in
September 2014. R. 54. However, the December 2014 left knee
replacement surgery did not terminate the pain in her left knee.
R. 54. At the time of the testimony Plaintiff stated that only
her left knee was bothering her. R. 54.

After Plaintiff's total left knee replacement surgery the
entire right side of her face was numb, and continued to be numb
for weeks after. R. 54. Plaintiff was also using braces and
crutches "all the time" to get around. R. 55. Plaintiff
testified that "according to Dr. Bedair, everything looks good"
since the surgery. R. 55. But, she believed that Dr. Bedair was
only referring to the knee transplant and x-rays and "[didn't]
take into consideration the numbness . . . or the pain." R. 55.

18

Plaintiff also testified that the pain caused her to stay in bed "90 percent of the time." R. 55. She was always icing her knee. R. 55. When she wasn't in bed, Plaintiff had difficulty getting up and down stairs, but she could walk two or three blocks on her crutches. R. 56. She could sit on her recliner when her leg was straight and elevated. R. 56.

Plaintiff does not "dare" drive and her husband drives her around for appointments. R. 57. Plaintiff felt she could probably lift a gallon of milk, but that she could not kneel down or crouch at all. R. 57.

Finally, Plaintiff testified that if she tried to get a job she believed she would "never pass a drug test" because of her pain medication. R. 58.

### b. Testimony of Plaintiff's Husband, Mr. Pierce

Plaintiff's husband, Mr. Pierce, testified as follows: Plaintiff typically would wake up, take her pills, and not wake up again until "four, five, or six hours" later and would "basically [be] in pain again." R. 58-59. Mr. Pierce testified that Plaintiff would be "in tears all the time" and that the pain medication and frequency of medication was "kind of concerning." R. 58-59.

Mr. Pierce also testified that Plaintiff's last employer laid her off two days after she gave them notice that she would be getting knee surgery, and that he believed "that was the

reason" they laid her off. R. 58-59. Finally, Mr. Pierce stated
that the pain medications were what he believed were stopping
Plaintiff from driving. R. 62-63.

### c. Vocational Expert

The ALJ also questioned Dr. Amy Vercillo, a vocational
rehabilitation counselor and the vocational expert. R. 60-62.
The ALJ asked Dr. Vercillo to consider the hypothetical
situation of a claimant with similar age, education and work
history to that of Plaintiff with the following exertional
limitations: able to lift 20 pounds occasionally and 10 pounds
frequently, stand or walk at least two hours a day; can
occasionally balance; can never climb, stoop, kneel, crouch or
crawl or climb a ladder; has to occasionally be able to elevate
her left lower extremity during the workday at a height of 45
degrees and can occasionally push or pull with her lower
extremity; and must avoid concentrated exposure to vibrations
and hazards. R. 61. Dr. Vercillo was asked by the ALJ whether a
hypothetical claimant such as the one above could perform
Plaintiff's past relevant work. R. 61. Dr. Vercillo testified
that such a claimant would be able to perform the past relevant
work. R. 61.

The ALJ then asked Dr. Vercillo to consider the same
hypothetical claimant except to further assume that the
individual would be off task 20 percent of the time because of

the pain. R. 61-62. Dr. Vercillo testified that such an individual "would not be able to sustain this or any competitive work on a sustained basis because that would be a substantial amount of time off task and would not allow for even unskilled work." R. 62.

## VI.  Decision of the ALJ

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of June 5, 2013. R. 16. At step two, the ALJ found that Plaintiff's knee disorder was a severe impairment and caused significant limitation in her ability to perform basic work activities. R. 16. At step three, he found that Plaintiff's impairment or combination of impairments did not meet or was the medical equivalent of the listed impairments in the regulations. R. 16. At step four, he found that Plaintiff had the residual functional capacity to perform sedentary work except that:

> [she is] never able to climb, balance, stoop, kneel, crouch, or crawl, is limited in ability to reach in all directions including overhead, must avoid all exposure to vibration and hazards, moderate exposure to extreme cold and heat and concentrated exposure to wetness, humidity, noise and fumes, odors, dusts, gases and poor ventilation.

R. 17. With respect to Plaintiff's pain medication, the ALJ found that her side effects improved with adjustments to her regimen and Plaintiff reported improved mental clarity. R. 19. As a result, the ALJ concluded that Plaintiff's statements

regarding the intensity, persistence, and limiting effects of her overall symptoms were "not fully credible." R. 19. Based on the RFC finding, he found that Plaintiff was able to perform her past relevant work as an underwriting assistant. R. 20. Thus, the ALJ found that Plaintiff was not disabled under the Social Security Act.

## PROCEDURAL HISTORY

Plaintiff filed for disability insurance benefits on May 12, 2014 alleging disability commencing June 5, 2013. R. 14, 132-35. The application was denied at the initial level and upon reconsideration. R. 82-88. Plaintiff requested a hearing which was held before ALJ William Ramsay on April 14, 2015. R. 43-63.

On May 20, 2015, the ALJ found that Plaintiff was not disabled. R. 11-22. On August 28, 2015, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. R. 1-4. At that point, the ALJ's decision became final as to those claims.

The case is now ripe for review under 42 U.S.C. § 405(g).

## DISCUSSION

### I.   Standard of Review

This Court may only set aside the decision of an ALJ if the decision resulted from legal error, or if the ALJ's factual findings were not supported by substantial evidence. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999). This Court does not

make de novo determinations. Lizotte v. Sec'y of Health and Human Servs., 654 F.2d 127, 128 (1st Cir. 1981); White v. Astrue, No. 10-10021, 2011 WL 736805, at *5 (D. Mass. Feb. 23, 2011).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. of N.Y. v. N.L.R.B., 305 U.S. 197, 229 (1938); Astralis Condo. Ass'n v. Sec'y, United States Dep't of Hous. and Urban Dev., 620 F.3d 62, 66 (1st Cir. 2010). This Court must uphold the ALJ's determinations as long as they are supported by substantial evidence, even if the record evidence could support a different conclusion. Rodriguez v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); Lizotte, 654 F.2d at 128. "The ALJ's findings of fact are conclusive when supported by substantial evidence." Nguyen, 172 F.3d at 35; Manso-Pizzaro v. Sec'y of Health and Human Servs., 76 F.3d 15, 16 (1st Cir. 1996).

The ALJ's findings "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35. In determining the quality of the evidence, the Court will examine the record as a whole. Rohrberg v. Apfel, 26 F. Supp. 2d 303, 306 (D. Mass. 1998).

## II.   Statutory and Regulatory Framework

Under the Social Security Act, a claimant seeking benefits must prove they do not have the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this definition, a person must have a "severe impairment that makes [them] unable to do . . . past relevant work . . . or any other substantial gainful work that exists in the national economy." 20 C.F.R. § 416.905(a). An impairment can only be disabling if it "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Secretary of Health and Human Services ("the Secretary") has established a five-step sequential evaluation process for the ALJ to employ in determining whether a person is disabled. 20 C.F.R. § 404.1520(a)(4). The determination may be concluded at any step along the process if the ALJ determines that the claimant either is or is not disabled. Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001); 20 C.F.R. § 404.1520(a)(4) ("If we can find that you are disabled or not

disabled at a step, we can make our determination or decision and we do not go on to the next step.").

In the first step, if the claimant is currently engaged in substantial gainful work activity, then the claimant is automatically considered not disabled, and the application for disability benefits is denied. Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(i). At step two, if the claimant does not have a severe impairment or severe combination of impairments within the relevant time period, the disability claim is denied. Bowen v. Yuckert, 482 U.S. 137, 141 (1987); 20 C.F.R. § 404.1520(a)(4)(ii).

If a condition is severe, then the ALJ proceeds to the third step to determine whether the severe impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe that they preclude substantial, gainful activity. Yuckert, 482 U.S. at 141; Seavey, 276 F.3d at 5; 20 C.F.R. § 404.1520(a)(4)(ii); see 20 C.F.R. § 416.920. If the impairment meets one of the listed impairments, the claimant is presumed to be disabled and the application is granted. Goodermote v. Sec'y of Health and Human Servs., 690 F.2d 5, 6 (1st Cir. 1982); 20 C.F.R. § 404.1520(a)(4)(iii). However, if the impairment does not meet one of the listed impairments, the ALJ must determine whether the claimant's RFC, along with her work history and age, prevents her from

performing past relevant work. Seavey, 276 F.3d at 5;
Goodermote, 690 F.2d at 6-7; 20 C.F.R. § 404.1520.

The claimant's RFC is the "the most [she] can still do
despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). Her
"impairment(s), and any related symptoms, such as pain, may
cause physical and mental limitations that affect what [she] can
do in a work setting." Id. If the claimant cannot perform this
work, the fifth and final step is to determine whether the
claimant is able to perform other work in the national economy
in view of the claimant's RFC, age, education, and work
experience. Seavey, 276 F.3d at 5; 20 C.F.R. §
404.1520(a)(4)(v). If the claimant is unable to perform other
work, the application for benefits is granted. Seavey, 276 F.3d
at 5; 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

In the first four steps, the claimant bears the burden of
proof to show she is disabled. Freeman, 274 F.3d at 608;
Rohrberg, 26 F. Supp. 2d at 306. At the fifth step, the burden
shifts to the Commissioner to present evidence of specific jobs
in the national economy that the applicant is able to perform.
Goodermote, 690 F.2d at 7 (1st Cir. 1982); Arocho, 670 F.2d at
375.

## III. Analysis

The key issue in this case is whether the ALJ failed to properly consider the effect of pain and pain medication on Plaintiff's RFC.

Plaintiff has a consistent medical record documenting the use of pain medication and its effects on her mental capacity. Since the alleged onset of her disability on June 5, 2013, Plaintiff has taken various combinations and doses of the following pain medications: Percocet, Neurontin, Amitriptyline, Valium, Oxycodone, Vicodin, Tramadol, Diazapam, Gabapentin, Baclofen, and Robaxin. The record showed that Plaintiff met with her treating physician, Dr. Flood, many times because of mental confusion and difficulty with daily activities due to her medication. See, e.g., 357-60, 368-69.

On October 10, 2013 Plaintiff met with Dr. Flood to discuss her medications and Dr. Flood adjusted her prescriptions. R. 369. However, Plaintiff continued to have problems. On March 5, 2014, Dr. Flood referred her to a pain management clinic in order to get further treatment for her pain symptoms. R. 367-68. As of March 7, 2014, she was taking Oxycodone five times a day, Diazepam four times a day, and Neurontin twice a day. R. 277. Dr. Anita Sadasivan Dasari treated Plaintiff at her pain management clinic specifically for side effects from her pain medications from March until June, 2014. R. 303-09.

27

Pain problems appeared to persist during and after her treatment at the pain management clinic. In May of 2014, near the end of her time at the treatment clinic, Plaintiff continued to complain to Dr. Flood about her issues with medication. On May 8, 2014, Plaintiff had an appointment with Dr. Flood to discuss her medication. R. 361. She wanted to find a resolution to the pain rather than taking medication. At this point she was still taking oxycodone, but Dr. Flood noted that there had yet to be any invasive or semi-invasive treatment that worked to treat Plaintiff's pain. R. 361.

On July 21, 2014 Plaintiff complained to Dr. Flood of diminished mental clarity, confusion, and "sleeping a lot" over the past month or two. R. 359. Dr. Flood described her speech as slightly slurred, and while Plaintiff answered questions appropriately, her responses were somewhat slow. R. 359. Dr. Flood determined this was probably related to over medication. R. 359. On August 11, 2014, Plaintiff complained of drowsiness from her medication and Dr. Flood described her as having a "sluggish" mental state. R. 357.

Eventually the Plaintiff had two total knee replacement surgeries. The right knee replacement was successful but the left knee continued to cause Plaintiff pain. Again, she had effects from the pain medication and, in March 2015, Dr. Flood again said she was disabled.

The Plaintiff also stated at the hearing on April 4, 2015 that she was still in a lot of pain. She stated she had a doctor's appointment the next day to address her pain: "And I do have a doctor's appointment tomorrow regarding my pain. They're talking about upping it to Fentanyl." R. 63.

Thirty years ago, in Avery v. Sec'y of Health and Human Servs., the First Circuit set forth the standards for an ALJ in considering complaints of pain. 797 F.2d 19, 21 (1st Cir. 1986) (statements by a claimant concerning the intensity of his pain, if deemed credible by the ALJ, may sometimes "permit a finding of disability [under the Social Security Act] where the medical findings alone would not"). "[W]hen there is a claim of pain not supported by objective findings, the adjudicator is to 'obtain detailed descriptions of daily activities by directing specific inquiries about the pain and its effects [on] the claimant . . . .'" Id. at 23 (quoting Program Operations Manual System, DI T00401.570). Avery requires the ALJ to consider six factors in evaluating a claimant's subjective allegations of pain:

(1) The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

(2) Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

(3) Type, dosage, effectiveness, and adverse side-effects of any pain medication;

(4) Treatment, other than medication, for relief of pain;

(5) Functional restrictions; and

(6) The claimant's daily activities.

Id. at 29.

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so supported by substantial evidence in the record. Bazile v. Apfel, 113 F. Supp. 2d, 181, 186 (D. Mass. 2000) (citing DaRosa v. Secretary of Health and Human Servs., 803 F.2d 24, 26 (1st Cir. 1986)).

Despite Plaintiff's history of pain and attempts to recalibrate her medication, the ALJ found that Plaintiff was not credible in her statements of the intensity, persistence, and limiting effects of the symptoms of her impairment. In his opinion, the ALJ addressed plaintiff's complaints of pain from the left knee and acknowledged that she took "pain medication that causes drowsiness and causes her to sleep during the day." R. 17. However, he ultimately found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" for reasons which are not supported by substantial evidence. R. 19.

First, the ALJ concluded that the side effects improved with adjustments to the medication regimen and dosage and that Plaintiff reported "improved mental clarity." R. 18-19. The

record does indicate some temporary improvement in the side effects with adjustments to medication and dosage. In January 2015, nurses reported that Plaintiff seemed "dopey or groggy" and Plaintiff reported feeling sleepy because of the medication. R. 485. As a result, on January 5, 2015, Dr. Flood recommended adjustments to her medications, after which, on January 13, 2015, he reported that Plaintiff seemed "mentally clearer." R. 483-86. This adjustment did not resolve the issue, however, as Plaintiff was hospitalized two months later in March 2015 because her medications caused a "change in mental status." R. 479. Her medications had to be adjusted again during that hospitalization. R. 479. As her long-time treating physician, Dr. Flood made clear in March 2015 the medications were still having side effects which precluded her from working. R. 495.

Second, the ALJ found Plaintiff not to be credible since Plaintiff's symptoms did not align with the Function Report dated April 5, 2013, that state she is "able to prepare simple meals, do laundry, cleaning, care for pets, drive, do shopping in stores and online, handle finances, read, watch TV, do craft work, use the phone and use Facebook." R. 19. However, the Function Report was completed in 2013, prior to both knee surgeries and was no longer accurate. Significantly, both her husband and she testified at the hearing that she could not drive because of the pain medications.

31

Third, the ALJ also referenced a conversation Plaintiff had with Mary Griffin NP on March 20, 2014, in which she told Ms. Griffin she was "looking for work." R. 19. This statement, however, is taken out of context. In her meeting with Mary Griffin, Plaintiff stated that she "is discouraged because of her knee pain and limitations on life style because of the knee pain" and wanted to return to work because she is bored at home, but also that she was "still having trouble getting up and out of a chair walking" and she is "'sick of taking pills' and wants to be active and off pills." R. 363. A desire to go back to work is laudable, but it is not the same as having the ability to work while on the pills.

Fourth, and most importantly, the ALJ improperly discredited the statements of the treating physicians. Plaintiff's complaints of pain and the side effects of her pain medication were supported by statements from her two treating physicians -- Dr. Flood, her treating physician, and Dr. Foster, her treating orthopedic surgeon. In both his July 2014 and August 2014 statements, prior to the knee replacements, her primary care physician, Dr. Flood, wrote that Plaintiff was under treatment for chronic pain with "six different medications" and "as a result of the combined medications' side effects" Plaintiff was permanently disabled. R. 356, 394. On March 25, 2015, Dr. Flood "opined that due to medication side

32

effects the claimant is not able to work in any capacity and is disabled for 2 years and possibly permanently." R. 495. "She has had multiple surgical procedures on both knees. She is also under treatment for chronic pain with multiple medications. As a result of the combined medications, side effects, chronic pain, and stiffness in her leg, she is not able to work in any capacity." R. 495.

Dr. Foster's office supported Plaintiff's application for disability on August 19, 2014, pointing out that Plaintiff had "required daily narcotic pain medication to help alleviate the pain" and was "unable to work for quite some time." R. 395.

The ALJ fairly relies on the opinion of Dr. Henry Bedair, another treating orthopedic surgeon, that on or about November 19, 2014, Pierce was recovering well from the right total knee replacement. R. 441. However, this evaluation was before the left total knee replacement and therefore before post-surgery left knee problems and pain. R. 441. While there is evidence that Plaintiff could extend her left knee, Dr. Bedair did not opine on the effect of Plaintiff's multiple pain medications after the left knee surgery. The non-treating physicians gave their opinions in June and August 2014 prior to both surgeries. Dr. Flood, the treating physician, had a follow-up appointment with Plaintiff and submitted his opinion in March 2015 after both surgeries. During the follow-up appointment Dr. Flood found

that, after Plaintiff's hospitalization for overmedication, she was mentally "much clearer," yet she still had chronic pain disorder, confusion, and drug interaction. R. 479. Indeed, he said she had a fracture in the left knee at the site of the knee replacement. R. 479. Then, in his March 25, 2015 opinion Dr. Flood found that "[a]s a result of the combined medications' side effects, chronic pain, and stiffness in her leg, she is not able to work in any capacity," R. 495. The ALJ did not adequately explain why he failed to give Dr. Flood's opinion weight, as it was consistent with the objective evidence, i.e., a fracture in the left knee. 20 C.F.R. § 404.1527(c).

These cases involving chronic pain syndrome and extensive prescription of pain medications are difficult. However, the ALJ failed to give adequate weight to the treating physicians in addressing claimant's ability to work, especially considering none of the non-treating physicians opined on the side effects of the pain medication nor did they evaluate the Plaintiff after both knee replacements. See Rosado v. Sec'y of Health and Human Servs., 807 F.2d 292, 293 (1st Cir. 1986) (finding that where the ALJ disregarded the only residual functional capacity evaluation in the record, he effectively, and inappropriately, substituted his own judgment for uncontroverted medical evidence). The case is remanded for a medical evaluation of

Plaintiff's pain and the effects of the pain medications after the two knee replacement surgeries.

### ORDER

The Court **DENIES** Defendant's motion to affirm the decision of the Commissioner (Docket No. 12) and **ALLOWS** Plaintiff's motion to reverse and remand the decision of the Commissioner (Docket No. 11).

/s/ PATTI B. SARIS_____
PATTI B. SARIS
Chief, United States District Judge